IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                     PLAINTIFF

VS.            Criminal No. 2:14-cr-20017-PKH-MEF-1
                Civil No. 2:19-cv-02068-PKH-MEF

CALLIOPE "OPE" ROCKY SAAGA                           DEFENDANT

**<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>**

Before the Court is the Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody filed May 31, 2019. (ECF No. 37). The United States filed its response on June 27, 2019. (ECF No. 42). Defendant did not file a reply. The matter is ready for Report and Recommendation.

**I.  Background**

On May 7, 2014, Defendant, Calliope "Ope" Rocky Saaga ("Saaga"), was named in an Indictment charging him with three counts of wire fraud in connection with a scheme to defraud the Fort Smith Southside High School Band, its students, parents, and friends of the Band regarding a trip to Hawaii planned for 2012. (ECF No. 1).

Saaga was arrested on May 8, 2014. (ECF No. 13). He appeared for arraignment on June 9, 2014, at which time James B. Pierce ("Pierce"), an Assistant Federal Public Defender ("AFPD"), was appointed to represent Saaga and he entered a not guilty plea to each count of the Indictment. (ECF No. 7). Pierce requested discovery in open court, and Saaga was released on a signature bond and conditions of release. (ECF Nos. 7, 9, 10, 11).

On October 16, 2014, Saaga appeared with counsel before the Hon. James R. Marschewski, U. S. Magistrate Judge, for a change of plea hearing. (ECF No. 16). Consent to proceed before a Magistrate Judge was executed by Saaga on the same date. (ECF No. 15). Pursuant to a written

–1–

Plea Agreement (ECF No. 17), Saaga pleaded guilty to Count Three of the Indictment charging him with Wire Fraud, in violation of 18 U.S.C. § 1343. (ECF No. 16). A Report and Recommendation that Saaga's guilty plea be accepted and the Plea Agreement tentatively approved, subject to final approval at sentencing, was filed by Judge Marschewski on October 16, 2014. (ECF No. 19). An Order adopting the Magistrate Judge's Report and Recommendation was entered by the Hon. P. K. Holmes, III, Chief U. S. District Judge, on October 17, 2014. (ECF No. 20).

An initial Presentence Investigation Report ("PSR") was prepared by the United States Probation Office on January 6, 2015. (ECF No. 21). On January 9, 2015, the Government advised that it had no objections to the initial PSR. (ECF No. 23). On January 23, 2015, Pierce submitted four objections to the initial PSR on Saaga's behalf. (ECF No. 24). Three of Saaga's objections concerned factual matters that did not affect the guidelines calculation, and the fourth objection opposed application of a sentencing enhancement under U.S.S.G. § 3B1.3 for "abuse of trust." (*Id.*).

On February 20, 2015, a final PSR was submitted to the Court. (ECF No. 25). In an Addendum, U. S. Probation noted resolution, or no changes made, as to all objections. (ECF No. 25-1). The final PSR determined that Saaga was accountable for an actual loss to his victims in the total amount of $782,480, most of which was used to support and enhance Saaga's lifestyle, including gambling. (ECF No. 25, ¶¶ 47-51, 76).

Saaga's Base Offense Level was determined to be 7 pursuant to U.S.S.G. § 2B1.1(a)(1). (ECF No. 25, ¶ 81). The actual loss to victims of $782,480 resulted in a 14-level enhancement.[1]

---

[1] A loss greater than $400,000 but less than $1,000,000. U.S.S.G. § 2B1.1(b)(1)(H).

(*Id.*, ¶ 82).  Since the offense involved 250 or more victims, a 6-level enhancement applied pursuant to U.S.S.G. § 2B1.1(b)(2)(C). (*Id.*, ¶ 83).  Further, since Saaga had abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense, another 2-level enhancement was applied pursuant to U.S.S.G. § 3B1.3. (*Id.*, ¶ 85).  These enhancements resulted in an Adjusted Offense Level of 29. (*Id.*, ¶ 87).  After a 3-level reduction for acceptance of responsibility, Saaga's Total Offense Level was determined to be 26. (*Id.*, ¶¶ 89-91).  Saaga had no criminal history, so his criminal history score of zero placed him in Criminal History Category I. (*Id.*, ¶ 99).

The statutory maximum term of imprisonment for the count of conviction is 20 years. (*Id.*, ¶ 124).  Based upon a Total Offense Level of 26 and a Criminal History Category of I, the advisory guidelines sentencing range was 63 to 78 months imprisonment. (*Id.*, ¶ 125).

Saaga appeared for sentencing on March 30, 2015. (ECF No. 28).  Upon inquiry, Saaga stated that he was satisfied with the representation and advice of his counsel. (ECF No. 41, p. 3).  The Court confirmed that Saaga had an opportunity to review and read the PSR and discuss it with his counsel. (*Id.*).  The PSR was reviewed in open court, and counsel agreed that Saaga's position regarding the abuse of trust enhancement had been fully briefed to the Court. (*Id.*, pp. 4-5).  After analyzing the law pertaining to the enhancement, the Court found the presence of all three elements to support application of the enhancement, and Saaga's objection to the enhancement was overruled. (*Id.*, pp. 5-7).  Noting a small discrepancy of $264.11 in the total amount of the victims' losses, the Court amended the PSR to reflect that the amount of loss was $272,235.89. (*Id.*, p. 8).  The Court expressed final approval of the Plea Agreement. (*Id.*, pp. 8-9).  Victim impact statements were received, and the Director of the Southside High School Band addressed the Court at sentencing. (*Id.*, pp. 12-14).

Pierce argued that Saaga had a severe gambling addiction during the time the fraud occurred, and that he "engaged in this fraudulent behavior after creating a financial disaster through irresponsible and unwise business decisions including mishandling people's money, and then turning to his personal addiction of gambling in a reckless effort to try to resolve the financial mess." (*Id*., p. 18). Noting Saaga's lack of criminal history and positive character traits, Pierce argued for a slight downward variance to a sentence of 60 months. (*Id*., pp. 19-20).

The Court then imposed a low-end Guidelines sentence of 63 months imprisonment, to run concurrently with the 60-month sentence imposed on Saaga in a similar case in the Western District of Missouri. (*Id*., p. 28). Three years supervised release was imposed, to run concurrently with the supervised released imposed in the Western District of Missouri. (*Id*.). The Court found Saaga had no ability to pay a fine, so no fine was imposed, but payment of restitution in the amount of $272,235.89 and a $100.00 special assessment was ordered. (*Id*., p. 29). Upon imposition of sentence, the Court advised Saaga of his appellate rights, including the right to appeal *in forma pauperis*. (*Id*., p. 31).

Judgment was entered by the Court on March 31, 2015. (ECF No. 29). An Amended Judgment was entered on April 9, 2015 to correct a clerical error in the restitution list attached to the Judgment. (ECF Nos. 31, 32). A second Amended Judgment was entered on May 11, 2015 to correct another clerical error in the restitution list. (ECF Nos. 35, 36).

Saaga did not pursue a direct appeal from the Judgment.

On May 31, 2019, Saaga filed his *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (the "Motion"). (ECF No. 37). The Motion raises three grounds for relief:

Ground One: Ineffective assistance of counsel in the plea agreement phase for failing "to

properly and fully inform Petitioner of immigration consequences of guilty plea." (ECF No. 37, p. 4).

Ground Two: Ineffective assistance of counsel for failing to object to an erroneous guideline calculation. Saaga claims counsel "failed to object to the inclusion of non-victims in the victim count for the purposes of USSG 2B1.1(b)(2)(C)." (*Id*., p. 5).

Ground Three: Ineffective assistance of counsel for failing to postpone the sentencing hearing. Saaga claims that "[l]ess than 60-days after Petitioner was sentenced new guideline changes became effective. These changed guidelines would have resulted in a reduced sentence." (*Id*., p. 7).

Regarding timeliness, Saaga alleges he received notice on January 16, 2019 that the Government was starting removal proceedings, and according to 28 USC § 2255(f)(4) his petition is timely. (*Id*., p. 11).

The United States responded to the motion on June 27, 2019. (ECF No. 42). Despite seeking and obtaining leave to file a reply (ECF Nos. 43, 44), Saaga did not file a reply.

## II. Discussion

"A prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment

vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).  A thorough review of Saaga's Motion and the files and records of this case conclusively shows that Saaga is not entitled to relief, and it is recommended that his Motion be dismissed with prejudice without an evidentiary hearing.

### A.  Timeliness

A one-year period of limitation applies to motions under 28 U.S.C. § 2255.  This period runs from the latest of: (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or, (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2255(f).

### 1.  Date of Finality

The United States contends that Saaga's judgment of conviction became final on May 25, 2015 and that his motion is untimely.  The United States also contends that § 2255(f)(4) is inapplicable to the facts of this case. (ECF No. 42, pp. 4-7).  The Court agrees, but for the reasons discussed below, the date Saaga's judgment became final was April 14, 2015.

The operative date in this case is "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1).  Saaga's Judgment was entered on March 31, 2015. (ECF No. 29). An Amended Judgment was entered on April 9, 2015, pursuant to Rule 36 of the Federal Rules of

Criminal Procedure, to correct a clerical error in the restitution list attached to the Judgment.[2] (ECF No. 32). A second Amended Judgment was entered on May 11, 2015, again pursuant to Rule 36, to correct another clerical error in the restitution list.[3] (ECF No. 36). It is this Amended Judgment that the United States uses to calculate the date of finality, however, not every change to a judgment results in a new sentence or judgment for purposes of § 2255.

Correction of a clerical or typographical error pursuant to Rule 36 does not substantively alter a prisoner's sentence or judgment. *See Dyab v. United States*, 855 F.3d 919, 923 (8th Cir. 2017) ("Correction of a clerical or typographical error pursuant to Criminal Rule 36 likewise does not justify disregarding prior § 2255 motions in the 'second or successive' calculus."). Here, as in *Dyab*, the Court did not alter the amount of Saaga's restitution obligation or otherwise change Saaga's sentence. The Court merely "ungrouped" certain restitution payees to facilitate payment to individual payees and then redacted the names of minor victims to protect their privacy rights. These actions were not sufficient to create a new sentence or judgment for purposes of § 2255. *See, e.g., United States v. Brown*, 915 F.3d 1200, 1202 (8th Cir. 2019) (correcting clerical and typographical errors pursuant to Rule 36 "does not substantively alter a prisoner's sentence, so a § 2255 motion filed after such a correction is still a challenge to the original judgment"); *Marmolejos v. United States*, 789 F.3d 66 (2nd Cir. 2015) (an amended judgment merely correcting clerical errors pursuant to Rule 36 does not constitute a "new judgment"). Thus, it is the entry of Saaga's original Judgment on March 31, 2015 that is applicable to the timeliness analysis in this case.

---

2 The clerical error related to come instances where multiple victims were members of the same family or had the same address, and the Court entered the victims' names on the restitution list as a group. This, however, created problems in processing payments to the individual victims, which was the Court's intention. (ECF No. 31).
3 This clerical error was made to redact the names of minor victims from the victims list appended to the Judgment. (ECF No. 35).

Had Saaga wished to file an appeal, he was required to do so within 14 days. *See* Fed. R. App. P. 4(b)(1)(A)(i). Saaga did not file an appeal, and his judgment of conviction thus became final on April 14, 2015. *See Murray v. United States*, 313 F. App'x 924 (8th Cir. 2009). From that date, Saaga had one year, or until April 14, 2016, to timely file a § 2255 habeas petition. Saaga's § 2255 Motion was filed on May 31, 2019 (ECF No. 37), over three years past the end of the limitations period.

Regarding timeliness, Saaga states: "On January 16, 2019 I received notice that the government was starting removal proceedings. According to 28 USC 2255(f)(4) this petition is timely." (ECF No. 37, p. 11). This allegation fails to bring Saaga's case within the scope of § 2255(f)(4). Well before January 16, 2019, Saaga was aware of his immigration status in the United States (lawful permanent resident), that he had committed and pleaded guilty to wire fraud, and that he had been adjudged guilty and sentenced.

In his written Plea Agreement, Saaga explicitly acknowledged that "pleading guilty may have consequences with respect to his/her immigration status if he/she is not a citizen of the United States"; that "a broad range of crimes are removable offenses, including the offense(s) to which defendant is pleading guilty"; that "defendant understands that no one, including his/her attorney or the district court, can predict to a certainty the effect of his/her conviction on his/her immigration status"; and, "Defendant nevertheless affirms that he/she wants to plead guilty regardless of any immigration consequences that his/her plea may entail, even if the consequences are his/her automatic removal from the United States." (ECF No. 17, ¶ 9). Further, at his change of plea hearing on October 16, 2014, the Court asked Saaga, "[d]o you understand that the Immigration and Custom Enforcement Agency may seek to deport you after you serve your sentence in this case? Do you understand that?" Saaga responded that he did. (ECF No. 40, p. 14).

The initial PSR reported Saaga's citizenship as "Western Samoa." (ECF No. 21, p. 2). The PSR also reported that "defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States." (*Id*., ¶ 92). The PSR further noted that Saaga became a permanent resident of the United States in 1995. (*Id*., ¶ 107). No objections or corrections were requested in connection with Saaga's citizenship information as reported in the PSR. At sentencing, Saaga informed the Court that he was fully satisfied with the counsel, representation, and advice he had received from his attorney, and he confirmed that he had an opportunity to review the PSR, including the revisions made after the initial disclosure, with his counsel. (ECF No. 41, p. 3).

"[A defendant's] reliance on subsection (f)(4) is misplaced as it is not the legal certainty of an alien's removal from the United States that triggers an obligation to bring a challenge to a conviction under § 2255(f)(4). Rather, it is the fact that [defendant] clearly knew he faced the likelihood of removal when his conviction became final, that triggered his obligation to file a motion to vacate his conviction." *See United States v. Deptula*, Crim. No. 5:10-cr-82-6, 2016 WL 7985815, at *6 (D. Ver. Oct. 13, 2016). The court in *Deptula* noted that several courts have rejected the argument that the § 2255(f)(4) limitation period commenced at the time a defendant first learned of removal proceedings. *Id*. (citations omitted). "[W]here the petitioner is on notice before his guilty plea that there are potential immigration consequences, the duty of due diligence arises at the time of the guilty plea." *United States v. Jackson*, No. 10-40, 2016 WL 825972, at *2 (W.D. PA. Mar. 3, 2016) (quoting *Puentes-Garcia v. United States*, 2013 U.S. Dist. LEXIS 67383, at *8, 2013 WL 1981176 (S.D. Ill. May 13, 2013).

Here, Saaga knew that he was not a citizen of the United States and that his guilty plea may have consequences with respect to his immigration status as early as August 30, 2014, the date he

signed his written Plea Agreement. (ECF No. 17, p. 14). Further, Judge Marschewski informed Saaga that his guilty plea may result in deportation after he served his sentence, and Saaga affirmed his understanding of this fact under oath at his change of plea hearing on October 16, 2014. (ECF No. 40, p. 14). The one-year period in which to file his § 2255 motion under § 2255(f)(4) was triggered on the same date that his conviction became final under § 2255(f)(1) – April 14, 2015. Thus, the time to file his § 2255 motion expired on April 14, 2016, and Saaga's Motion, filed on May 31, 2019, was filed over three years after the limitations period expired. Because the Motion has been filed beyond the one-year period of limitation, the Court lacks jurisdiction to consider the merits of Saaga's claims and the Motion should be summarily dismissed.

## 2. Equitable Tolling

The Eighth Circuit has recognized that the doctrine of equitable tolling is available to a § 2255 movant, but only "under limited conditions, for example, where extraordinary circumstances beyond a prisoner's control prevent the timely filing." *See Gassler v. Bruton*, 255 F.3d 492, 495 (8th Cir. 2001); *United States v. Martin*, 408 F.3d 1089, 1092 (8th Cir. 2005). The use of equitable procedures should be infrequent, *see Flanders v. Graves*, 299 F.3d 974, 976 (8th Cir. 2002), and will not be applied if the habeas movant has not diligently pursued his rights, *see Finch v. Miller*, 491 F.3d 424, 427 (8th Cir. 2007). "Equitable tolling is an exceedingly narrow window of relief." *Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005).

In the present case, Saaga has not argued that any extenuating circumstances beyond his control prevented a timely filing, nor has he even relied on the doctrine of equitable tolling. Saaga does not allege that anything the government has done made it impossible or difficult for him to uncover the facts that he now asserts in support of his claims. He does not allege that some action of the government lulled him into inaction. He does not refer to any extraordinary circumstances

attributable to the government, or to any other cause, that prevented him, in the exercise of reasonable diligence, from discovering the facts upon which his claims are based soon enough to enable him to bring a timely habeas petition. In sum, Saaga does not claim that any wrongdoing on the part of the government prevented him from filing a timely petition, nor does he show why he did not assert his claims within the one-year statute of limitations.

Saaga's only position is his statement that he first learned of the removal proceedings against him on January 16, 2019. As discussed above, Saaga was on notice of the potential immigration consequences of his guilty plea, and a duty of due diligence arose at the time of his guilty plea. Saaga has not exercised due diligence in the pursuit of his rights. He pursued no direct appeal, and while claims of ineffective assistance of counsel are properly brought in a § 2255 proceeding and not a direct appeal, he has alleged no facts that would support a delay in bringing his claims. Saaga has not alleged, for example, that he was in any way misled by his counsel or the government into his incorrect belief regarding the applicable limitations period or the timeliness of filing his § 2255 Motion.

Saaga's failure to timely file his § 2255 Motion is his fault alone. He has failed to allege and establish any factual basis for fitting within the "exceedingly narrow window of relief" equitable tolling provides, and his § 2255 Motion should be dismissed as untimely.

The undersigned will, nevertheless, proceed to address the merits of Saaga's claims.

### B. Standards Applicable to Ineffective Assistance of Counsel Claims

To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficient performance prong of the *Strickland* test, one must show that counsel's

representation fell below the "range of competence demanded of attorneys in criminal cases." *Id*. at 688. Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689. Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Courts also "do not use hindsight to question counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991). If one fails to establish deficient performance by counsel, the court need proceed no further in its analysis of an ineffective assistance of counsel claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

### C. Ground One: Failure to Inform of Immigration Consequences of Guilty Plea

Saaga first claims that his counsel's performance was constitutionally deficient in the plea agreement phase for failing "to properly and fully inform Petitioner of immigration consequences of guilty plea." (ECF No. 37, p. 4).

Criminal defense counsel has an obligation to inform a client whether a guilty plea carries a risk of deportation, and the failure to do so is subject to analysis under *Strickland*. *Padilla v.*

–12–

*Kentucky*, 559 U.S. 356, 374 (2010). Here, the record does not show that counsel performed deficiently in his obligation to inform Saaga of the immigration consequences of a guilty plea, or that Saaga suffered prejudice.

The written Plea Agreement signed by Saaga on August 30, 2014, contained the following provision expressly informing Saaga of the risk of deportation as a consequence of his guilty plea:

"**DEPORTATION CONSEQUENCES OF GUILTY PLEA**

9. Defendant recognizes that pleading guilty may have consequences with respect to his/her immigration status if he/she is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his/her attorney or the district court, can predict to a certainty the effect of his/her conviction on his/her immigration status. Defendant nevertheless affirms that he/she wants to plead guilty regardless of any immigration consequences that his/her guilty plea may entail, even if the consequences are his/her automatic removal from the United States, the denial of citizenship, and/or the denial of admission to the United States in the future." (ECF No. 17, p. 5, ¶ 9).

By signing the Plea Agreement, Saaga acknowledged that he "read this agreement (or has had this agreement read to him/her) and has carefully reviewed every part of it with defense counsel" and that he "fully understands this plea agreement." (ECF No. 17, p. 13, ¶ 28(a, b)). Thus, Saaga has represented that he read and carefully reviewed every part of the plea agreement, including the deportation consequences, with his counsel, and this obviously undermines his claim that counsel failed to inform him of the immigration consequences of his guilty plea.

Further, during the change of plea hearing on October 16, 2014, the Court asked Saaga, "[d]o you understand that the Immigration and Custom Enforcement Agency may seek to deport you after you serve your sentence in this case? Do you understand that?" Saaga responded, "[y]es, Your Honor." (ECF No. 40, p. 14). Saaga subsequently entered his guilty plea to the offense of conviction. (*Id.*, p. 17).

Moreover, when evaluating a defendant's claim that ineffective assistance of counsel led to the improvident acceptance of a guilty plea, the defendant must show "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Saaga makes no such showing here. Nowhere in his § 2255 Motion does Saaga state that he would not have pleaded guilty and insisted on going to trial if his counsel had informed him of the immigration consequences of a guilty plea.

In sum, the record does not support a finding of deficient performance by defense counsel in connection with the advice given to Saaga regarding the immigration consequences of his guilty plea, nor is there any support in the record to establish prejudice, and Saaga's first ground for relief fails.

### D.  Ground Two: Failure to Object to Guideline Calculation

Saaga's second ground for relief is his claim that counsel "failed to object to the inclusion of non-victims in the victim count for the purposes of USSG 2B1.1(b)(2)(C)." (ECF No. 37., p. 5).

The 2014 Sentencing Guidelines were used in this case. (ECF No. 25, p. 12, ¶ 80). U.S.S.G. § 2B1.1(b)(2)(C) provides for a six-level increase if the offense "involved 250 or more victims." Application Note 1 defines "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1) . . ." U.S.S.G. § 2B1.1 (2014), comment, (n. 1). The term "'[p]erson' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *Id*.

Contrary to Saaga's claim, defense counsel had no grounds for objecting to the enhancement based on the number of victims. Saaga admitted in his plea agreement that

"[a]pproximately 290 students, parents, and family members signed up and paid money for the Hawaii trip." (ECF No. 17, ¶ 2(f)). The PSR reported that the Southside High School band director provided the probation officer with a list of 260 victims who planned to attend the Hawaii trip, and the list contained specific loss amounts comprising the total funds wired to Saaga. (ECF No. 25, ¶ 77). The list of the 260 victims and the specific loss amounts was attached to the PSR. (ECF No. 25-2). Given the number of persons Saaga admitted to having signed up and paid for the Hawaii trip, along with the list of victims and the specific loss amounts provided by the Southside High School band director, it is reasonable to conclude that the United States could have proven there were more than 250 victims had counsel made an objection to the six-level enhancement. Since the United States could prove the number of victims necessary for the six-level enhancement to apply, it was reasonable for defense counsel to not object to the enhancement because any objection would have been without merit. It cannot be ineffective assistance not to raise a meritless argument. *Larson v. United States*, 905 F.2d 218, 219 (8th Cir. 1990); *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994).

Saaga has not shown that the result of the proceeding would have been any different had the objection been made, and his second ground for relief is subject to dismissal.

### E. Ground Three: Failure to Postpone the Sentencing Hearing

Saaga's third ground for relief is his claim that counsel should have sought a continuance of the sentencing hearing. He alleges, "[l]ess than 60-days after Petitioner was sentenced new guideline changes became effective. These changed guidelines would have resulted in a reduced sentence." (ECF No. 37, p. 7).

Saaga does not, however, specify what changes in the sentencing guidelines are applicable to him, and he fails to explain how any changes to the sentencing guidelines would have resulted

in a lower sentence. Vague and conclusory allegations are insufficient to state a ground for relief under 28 U.S.C. § 2255. *Hollis v. United States*, 796 F.2d 1043, 1046 (8th Cir. 1986). *See also: Blackledge*, 431 U.S. at 74 ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *Smith v. United States*, 677 F.2d 39, 41 (8th Cir. 1982) (conclusory allegations, unsupported by any specifics, are subject to summary dismissal); *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001) (brief, conclusory allegations that failed to cite to the record insufficient to support claims of ineffective assistance of counsel).

Even *pro se* litigants must state specific facts in support of their claims regarding counsel's allegedly deficient performance. *Saunders v. United States*, 236 F.3d 950, 952-53 (8th Cir. 2001). Saaga does not. Other than asserting that his counsel failed to request a continuance of the sentencing hearing, and that within 60 days of his sentencing changes occurred to the guidelines that would have resulted in a lower sentence, Saaga's Motion is devoid of any specific facts to support that a continuance of the sentencing was warranted and would likely have resulted in a lower sentence.

Moreover, the record belies Saaga's claim. He alleges that the unspecified guidelines changes became effective less than 60 days after his sentencing. His sentencing occurred on March 30, 2015. (ECF No. 28). Earlier that year on January 16, 2015, the United States Sentencing Commission (the "Commission") published a set of proposed amendments to the Sentencing Guidelines for public comment. 80 FR 2570-01, 2015 WL 188325. The period for public comment closed on April 30, 2015, and the Commission submitted the proposed amendments to Congress for review, with a specified effective date of November 1, 2015. 80 FR 25782-01, 2015

WL 1968941. Thus, it is clear from the history of the 2015 proposed amendments to the Sentencing Guidelines that they did not become effective within 60 days of Saaga's sentencing, but rather they became effective seven months later.

Next, even if Saaga's counsel knew about the proposed amendments at the time of sentencing, Saaga still cannot demonstrate that counsel's failure to seek a delay of the sentencing until the proposed amendments became effective constituted constitutionally deficient performance. As the United States correctly points out, at the time of Saaga's sentencing the proposed amendments were still under review for public comment, so their final form was not set and defense counsel would have had no way to know that the proposed amendments were certain enough to justify a delay of Saaga's sentencing.

A continuance to allow the proposed amendments to become effective would have required a delay of Saaga's sentencing for over seven months – from March 30, 2015 to November 1, 2015 or after. There is little likelihood that such a lengthy continuance would have been granted. It is a court's obligation to conduct sentencing without unnecessary delay. See Fed.R.Crim.P. 32(b) ("The court *must* impose sentence without unnecessary delay.") (Emphasis added). Further, "[i]t is improper for a judge to grant (or deny) a continuance for the very purpose of changing the substantive law applicable to the case." *United States v. Tanner*, 544 F.3d 793, 796 (7th Cir. 2008). "It is especially improper for a judge to delay sentencing because he wants to give the defendant a lighter (or a heavier) sentence than the current law permits, for 'the court must impose sentence without unnecessary delay.'" *Id*. at 797 (*quoting* Rule 32(b)(1) and affirming the district judge's refusal to grant a five-month continuance until the 2007 version of the sentencing guidelines went into effect to avoid the then-applicable 20-year mandatory minimum sentence). Upon such authority, the undersigned cannot conclude that counsel's performance in not seeking a seven-

month continuance of Saaga's sentencing was deficient.

As previously noted, Saaga does not identify what changes to the sentencing guidelines he believes would have resulted in a lower sentence. The United States suggests that Saaga may be referring to Amendment 791 (amending the fraud loss table in U.S.S.G. § 2B1.1(b)) and Amendment 792 (amending the victim table in U.S.S.G. § 2B1.1(b)), but it contends that neither of these amendments would have affected the sentencing outcome. The undersigned agrees.

The 2014 Sentencing Guidelines provided for a 14-level increase in offense level if the loss is more than $400,000 but less than $1,000,000. U.S.S.G. § 2B1.1(b)(1)(H) (2014). Saaga received a 14-level increase of his offense level because the actual loss resulting from his conduct amounted to $782,480. (ECF No. 25, ¶¶ 76, 82). Under Amendment 791, a defendant's offense level is increased 14 levels where the loss exceeds $550,000 but is less than $1,500,000. U.S.S.G. Guidelines Manual, Suppl. To Appx. C, Amend. 791, at 102 (Nov. 1, 2015); U.S.S.G. § 2B1.1(b)(1)(H) (2015). Since the actual loss attributable to Saaga's conduct was $782,480[4], he would have still received a 14-level increase of offense level under Amendment 791. Thus, he can show no prejudice related to this change of the guidelines.

Nor can Saaga show prejudice from Amendment 792 not being applied in his case. The 2014 Sentencing Guidelines call for a six-level increase in offense level when the offense involves 250 or more victims. U.S.S.G. § 2B1.1(b)(2)(C) (2014). Saaga received a six-level increase in offense level because his offense involved 260 victims. (ECF No. 25, ¶ 77; ECF No. 25-2). Amendment 792 struck the "250 or more victims" language and revised § 2B1.1(b)(2)(C) to provide that a defendant's base offense level was to be increased by six levels if the offense "resulted in substantial financial hardship to 25 or more victims." U.S.S.G. Guidelines Manual,

---

4 Corrected to $272,235.89 at sentencing by the Court. (ECF No. 41, p. 8).

Suppl. To Appx. C, Amend. 792, at 110-14 (Nov. 1, 2015); U.S.S.G. § 2B1.1(b)(2)(C) (2015). Considering that there were 260 victims involved in Saaga's offense, most of whom lost $1,040 to $1,288 each, it is not unreasonable to conclude that the United States could have proved that at least 25 of those victims suffered a "substantial financial hardship" such that the six-level increase would still apply.

Saaga has not shown that the result of his sentencing would have been any different had a continuance been requested, granted, and the 2015 amendments to the Sentencing Guidelines been used in his case. His third ground for relief is subject to dismissal.

### III.  No Evidentiary Hearing Is Warranted

A movant is not entitled to an evidentiary hearing on a § 2255 motion if "the motion and the files and records of the case conclusively show that the [movant] is entitled to no relief." *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997) (quoting *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir. 1985). Such are the circumstances in this case where Saaga has alleged insufficient factual and legal support for his claims. The summary dismissal of Saaga's § 2255 Motion without an evidentiary hearing is appropriate.

### IV.  No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C. § 2253 only if the applicant has made a substantial showing of the denial of a constitutional right. A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present. *Slack v. McDaniel*, 529 U.S. 473 (2000). For the reasons discussed above, Saaga has not made a substantial showing of the denial of a constitutional right, and a Certificate of Appealability should be denied.

## IV. Conclusion

It is recommended that Saaga's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 37) be **DISMISSED with PREJUDICE**.

It is further recommended that a request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of February 2020.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE